Good morning and welcome to the Ninth Circuit. We have two cases submitted on the briefs, and our first case for argument is Greenlining Institute v. the FCC and U.S. Telecom. You may proceed. May it please the Court, my name is Harold Feld and I will be arguing the case for petitioners. Congress created the FCC to ensure reliable communications to all Americans. The FCC recognized unanimously that the bedrock of this responsibility were four core values that it identified in 2014, universal access, consumer protection, public safety and competition. The FCC recognized since 2010 that the phaseout of legacy telephone network would be a mammoth and complicated project and would require close supervision and cooperation with the states and information and education to consumers in order to protect these core values and ensure a smooth transition. Spurred by the aftermath of Hurricane Sandy, the FCC engaged in intense fact finding, detailed analysis across multiple proceedings. However, less than a year after the final rules were settled and went into effect, the FCC initiated repeal of many of these safeguards. An agency must show the following in order to reverse course. First, the interpretation that it now offers must not contradict the statutory scheme. This is typically the Chevron 1 analysis. Second, the FCC must explicitly acknowledge that it is changing direction. It must explain why the prior facts and interpretation of law no longer apply and it must provide a non-arbitrary explanation of the new rule. Finally, the agency must of course comply with its own procedural regulations and with the Administrative Procedure Act and approach the problem with an open mind. May I ask you, I do want to get to the merits that you're addressing in terms of this complete reversal on the part of the FCC. But I have several procedural questions I'm interested in. One has to do with standing, so no surprise to you. And then the second has to do with this scope of petition and whether you can say you're claiming you're going to appeal from two sections but then it turns out to be a broader petition. So let me start, if I might, with the standing issue and I'll turn to TURN, the T-U-R-N non-profit. There's a number of member affidavits which are kind of cookie cutter affidavits about use. But I didn't see anything there about TURN itself and its organizational purpose and how all this would tie together. Am I missing that in the record? TURN in the affidavits stated that these were members and as members, therefore, with regard to its organization, TURN has standing to represent those interests. TURN in its corporate disclosure statement that we submitted stated that it was a non-profit consumer advocacy organization. TURN in the affidavits, the members have stated that they are Copper Line subscribers and therefore they benefit from the protections that the FCC enacted. Additionally, TURN, additionally, they state that they would have difficulty finding substitutes, which was the reason. I have no problem with the member affidavits because they're quite clear as to what their issues are. It's the linking with them with the organizational purpose. And so you're saying that the organizational purpose is in the corporate disclosure statement? Is that the only place we would find it? Well, it is also in the comments. Yes or no? Where do we find it? It may also be found, Your Honor, in the comments that were submitted by TURN in the record to the FCC in which TURN states. But that's not a particularly helpful answer to the Court of Appeals. We're not supposed to hunt and peck through that record to look for TURN's standing, so to speak, if it doesn't allege it. So it may be in the record somewhere, but otherwise it's only in the organizational purpose. I mean, it's only in the corporate disclosure. Is that right? Well, Your Honor, I'm happy to represent that TURN is a membership organization and that these are their members and that it is a consumer advocacy organization of longstanding as represented by its participation before the FCC and these proceedings. Additionally, I would observe that the statute guarantees to any party who is aggrieved by the FCC's decision a right to appeal, that the standing of the members is satisfied by the affidavits, and that the organization has stated an interest in protecting its members before the FCC and is certainly by implication in its participation in this proceeding as well. Do any of the organizations claim standing on their own grounds? For example, these organizations presumably use telephone lines. Yes. Neshuka does claim standing on its own, and we have a note to that effect in the brief that Neshuka claims standing. Greenlining also, through its affidavit of its employee, claims standing in its own right in that it cannot communicate with its employee effectively if his telephone service is terminated and he cannot find a replacement. We would have to look to see whether those affidavits satisfy a diversion of resources type analysis. We have cited case law that the court may assume that when consumer protections are repealed, that those who are subscribers to the service have standing. That applies in the case of the individuals who are represented by TURN. It applies to greenlining through its employee. It's really a surprise, counsel, that as sophisticated as you are in matters with the FCC, that you neglected to set forth in any clear way the standing of the parties. It just seems like a terrible oversight at this level of sophistication, and you've written a very sophisticated brief. And I also don't understand why that, whether it's, whether the agencies, I'm sorry, whether the organizations that you represent don't have standing in their own right as consumers. That is, they have their own telephone lines, they may have their own fax machines that may be impacted by this rule and wouldn't have to rely on their membership. They can simply say, we're subscribers, we've got an account with AT&T, and we're not going to be able to use the fax machine. Yes, Your Honor, in the case of the specific organizational offices, because those were not dependent upon Copper Line service, we were hesitant to say that they had standing because of subscription to the Copper Line service. Certainly as users of the phone network, they are affected in their ability to contact and communicate with others who are still on the legacy system. But we were reluctant to rely directly upon their subscription to phones because they were not subscribers to the legacy copper service, or as far as we could determine, they were not subscribers to the legacy copper service. I do apologize for the oversight. I certainly hope that if the court is satisfied that constitutional standing is satisfied, that the court, given the strong preference for deciding cases on the merits, that the court will find that the showing is adequate. I believe the showing is fairly traceable. I apologize if we did not state it more clearly. In an administrative case for any aggrieved party under the APA, it shouldn't be particularly demanding. It should not have been terribly hard to have done. And I can only say, Your Honor, that my lack of familiarity with what is necessary to show in the Ninth Circuit, and as we stated, we believe that it was obvious that we had standing because of the subscriber and subscriber members. We did not believe that it was necessary to take the court's time with an extended connection of complaint. I mean, this is a threshold. We wouldn't be spending quite so much time on it if it weren't a threshold issue, of course, in every case. Let me go on then to the scope of the petition. And do you have any cases that basically say you can identify particular segments of an agency order that you're aggrieved about, file your petition, and then come to court and expand the scope of the petition? Well, Your Honor, I would say that neither we nor the FCC were able to discover any cases that were exactly on point. So I rest, therefore, on the court's rationale that we cited with regard to the right to amend where there is no prejudice in the treating of the cases and the treating of the petition as a right to amend as if it were a complaint before the district court and where it relates back as it does here. Since the court has jurisdiction, it should permit the amendment. The one argument made by FCC would be the hypothetical prejudice, let's say, of third parties or interveners if you appeal on two points, but in fact there's really four that are underlying your complaint. And what is your response to that? Our response is that the parties could indeed have — first, it is highly unlikely, but even if it were to occur, parties that are interested can appeal even after the deadline, can ask for intervention as a matter of the court granting the right to intervene even after the statutory intervention deadline has passed, and that accordingly the likelihood of harm is very slight. The preference for deciding all cases on the merits rather than punishing a mistake in the pleadings is extremely strong, as we have cited, and therefore the court should consider all of the arguments. If there are no further questions on these issues, I'd like to turn to the merits of the case beginning with the de facto — beginning, excuse me, with the functional test. Here there is both a Chevron 1 argument where the agency has simply not shown, as the Supreme Court has recently reminded us, that words in the statute tend to mean the same thing unless Congress provides a strong signal that it does not. However, the FCC points to no such signal, even though the same word service within the same statute has a clearly more expansive meaning than simply that which is defined by the tariff. For example, in 214A, where it refers to the FCC's right to authorize emergency services, that clearly cannot mean tariff. But even if we were to get past the Chevron 1 analysis to the Chevron 2 analysis, the agency simply failed at every level to explain why the commission had previously rejected this interpretation. The agency, while acknowledging that there is a difference between tariffed and de-tariffed services, does not provide any explanation to overcome the objection of the 2015 FCC as to why this is a significant internal contradiction that renders this interpretation implausible. The commission did not address the presence of the CPE database and the requirement for the carriers to already inform providers of equipment that would no longer work given a change notification. Counsel, in the experience of our court, and our court is a collegial body similar to other collegial bodies such as independent commissions, we sit on a three-judge panel. We may disagree with each other. One of us will write a dissent. We don't usually accuse each other of being wildly wrong. We accuse each other of having taken an unreasonable position of disagreeing on the law. If we take that position, the idea then that we would then rehear the case en banc may flip the result. And it's not unusual in a court of law to have opposing views. We see this all the time in the Supreme Court. You've got a policymaking commission here that has commissioners who have very strongly held views that are opposing. The idea that the commission would flip its views just doesn't strike me as surprising at all. Well, Your Honor, that is certainly true. However, there is an important balance that the Administrative Procedure Act strikes between the need for democratic accountability and the need for reason and stability in the rule of law. And that is the process that is set forth by this Court's precedents and by the Supreme Court with regard to the steps that the agency must go through. By forcing the agency to explicitly... What step did the agency not take that it had to take? The agency... You went through a number of steps. Which step didn't the agency take? The agency failed to acknowledge facts in the record. And, again, this goes more to notice than to the functional test. But as a general matter, the agency consistently failed to acknowledge facts in the record that the FCC in 2015 found to be compelling. The FCC failed to acknowledge its departure from precedent on multiple occasions. For example, when it stated that in 2017 that an incumbent would never fail to replace its network for losing customers, when it had explicitly found as early as 1999 that there are cases where it is economically rational for a carrier to abandon its customers. The Commission failed to explain why the facts in the record that it did acknowledge were no longer compelling. For example, it acknowledges that, yes, there might be some loss of service. But the Commission, in addressing this, said, failed to acknowledge the extensive record that was built with regard to the loss of service. It failed to provide any rational explanation as to why it was reversing course and why it no longer considered the fundamental values that it has identified as key as now subordinate to the value of deploying broadband. Finally, the Commission, even if it survived all of that, has an obligation that the explanation that it provides must be rational and supported by the record. There was extensive evidence that was gathered with regard to each one of these that there were problems on the ground that were happening and they were substantial. These disagreements were apparent in the 2014-2015 proceedings before the Commission. You had commissioners who disagreed. We have judges on our court who disagree. That doesn't make the positions unreasonable. We may think that each other is wrong, but it doesn't make them unreasonable. When you have a policymaking body and intervening election, a change in the composition of the Commission, it's not unusual that an agency would take a different view of the matter. That doesn't make it arbitrary and capricious. It is certainly the case that the agency can and I will ask to conclude since I would like to reserve the remainder of my time for rebuttal. But again, Your Honor, I would simply point to that while it is certainly appropriate for an agency to reweigh these things, it must do so explicitly. It cannot simply brush this off with a mere statement of well, there might be some loss when in fact it was demonstrated that there was loss. It cannot claim that there is no benefit to notification when on an extensive record it found that without notification there were actual incidents and widespread incidents of genuine confusion among consumers. It is the essence of arbitrary to claim... Let me just ask you and I'll make sure you get your rebuttal time. It seemed to me that one of the benchmarks of the Commission's decision was okay, we had the rule and in fact it did not play out the way it had hoped in terms of that the majority would have hoped it played out. Why isn't that reason enough to give a foundation to modify the rule as they did in 2017? Had the Commission compiled a record which was greater than the same conclusory statements that had been proffered and rejected by the Commission in 2015 and had the Commission engaged in an examination of the previous record and said well, you know, we have extensive record here but nevertheless we have an extensive record weighing on this side that this is imposing significant delay. The Commission could in fact have altered its opinion but that is not what the Commission did below. Instead what the Commission did below was to issue a notice of proposed rulemaking saying please tell us that this is incredibly burdensome. The carriers in the record repeated oh yes, this is incredibly burdensome without providing any evidence of the burden and finally the Commission in 2017 was required to address the reasoning that the Commission in 2015 found why it was not potentially burdensome. Thank you. Good morning. May it please the Court. I'm Sarah Citrin for the FCC and I wanted to advise the Court that I've ceded five minutes of my time to our supporting intervener. This case concerns the Commission's reconsidered judgment that aspects of its early orders created unnecessary regulatory burdens and stood to impede the deployment of modern communications networks and services. And I do want to get to the merits but since the Court was asking about standing I'd like to make clear that the Commission continues to believe the petitioners haven't shown standing here. We think that's true both because for the reason Judge McEwen, you were pointing out that they haven't made clear the nexus with the organizational purpose of these petitioners and looking at the affidavits individually as well and going issue by issue as the Court would do, I also think they haven't made the necessary factual showing of concrete injury and certainly not, Judge Bybee, of direct injury. There are two employee affidavits but neither of those, as opposing counsel candidly conceded, shows injury to the employer as opposed to the individual employee. I know in other cases there's been a supplementation of the record permitted and here if one were to say that they're maybe close but not quite close enough in terms of this nexus and whether the corporate disclosure would satisfy that or not, do you agree that there is authority for permitting supplementation of the record in this kind of situation? I think the Court could do that. I do think it would, to make the necessary showing here, it's my view that petitioners would have to do more than just tidy up the nexus with their organizational purpose. None of these affiants have shown that their service is substantially likely to be retired any time soon or their service change or their facilities required. A number of them make, Judge McKeown, I think you called them cookie cutter statements and I would say that's accurate of their preference to continue with the legacy service that they've had for many years but a preference is not an injury and similarly the discussion of losing power, for example, that was one prevalent theme in these affidavits and power is not, that wouldn't be relevant, for example, to the Section 214 issue because power is a network change consideration and the Commission has addressed that by requiring there to be backup power made available to consumers. So I won't belabor the point but I do believe that on the facts they have more to do than just make clear the nexus to the organization's purpose. Turning to the merits, Section 2. What about the 60-day problem? Again, we think that the direct notice and state notice parts of the case aren't properly before the court. But if they had just said we appeal the order, they'd be okay. They would be. The problem was they said we're going to appeal these paragraphs of the order. Are you prejudiced in some way when they decided to do something a little broader? It is a function of their decision. I don't think we need to show prejudice. But I do think, I don't think we can rule out prejudice either because as our interveners pointed out in their brief, parties monitor these cases up to a certain point but they don't monitor every case. You know, certainly the FCC was going to be a participant in the case in any event. But there might have been others who once they saw, okay, the scope of this appeal is narrow. It just seems like it's not really in anybody's interest to enforce that rule too closely. I think you're going to win the battle and lose the war because the next petition will say I petition from this order. Nobody's ever going to be specific again. And that is typically what petitioners do. So we think it's a jurisdictional requirement that the court should enforce and I would say that under the Washington Utilities. Does the statute actually refer to jurisdiction? The Hobbs Act, the 60-day window under the Hobbs Act is jurisdictional and we cited case law that I think supports the idea that the provisions in Federal Rule of Appellate Procedure 15A are mandatory. Well, they can be mandatory without being jurisdictional. I mean, we've had, the cases you're citing, we've had this whole series of what's jurisdiction, what's not jurisdiction. The Supreme Court's tried to clarify that. So we have a lot of cases that use the word jurisdiction but they don't really mean jurisdiction. I'll concede that there's, I wouldn't claim that there's any case directly on point on this issue but we think that we stand by our brief on this point. And as to Section 214A, the statute requires a carrier to obtain the commission's advanced approval before it discontinues, reduces or impairs a service. But this Section 214A doesn't define what a service, what is a service and for that reason in a declaratory ruling in 2014 and a follow-on order in 2015, the commission sought to clarify its understanding of that ambiguous statutory term. And the commission at that time thought that the better statutory reading was to look to a, impose a kind of totality of the circumstances analysis which it called the functional test. And it made clear that it thought one consideration for determining when a carrier has to file one of these discontinuance applications is whether a, what customers, what the carrier's customers have come to expect they will be able to do with what they buy from the carrier including operating third party devices. In 2017, in the order under review, the commission decided that that statutory interpretation had been a mistake. It didn't say that the earlier commission's interpretation was implausible, Judge Bivey, I think as you recognize, but it said that the better statutory reading was to recognize service in terms of how a carrier has described its offering, whether in its tariff or in service agreements. And that interpretation made more sense to this commission, particularly in light of Section 203C of the Act which codifies the common law filed tariff doctrine. Under 203C, a carrier is not permitted to give a privilege to any person in connection with its service that is not set forth in the tariff. And this commission reasoned that it would make no sense to require carriers to seek approval before discontinuing a privilege or something in connection with their service that they couldn't lawfully have offered in the first place. The commission thought not just that that was the better statutory interpretation, but that this was a reasonable interpretation as a matter of policy. And the commission was concerned that under the totality of the circumstances analysis, carriers would be left guessing as to how their customers were using the service that they offered to the public. And that regulatory uncertainty would prompt carriers, the commission feared, to just maintain their legacy services in perpetuity, which would deplete the resources available for carriers to invest in upgrading services and networks. And those upgrades were important to a majority of consumers, the commission found. The commission did recognize that there are some consumers, a smaller group, who would prefer to continue using legacy services and were concerned that their third-party devices wouldn't work after a service upgrade. But the commission thought that that concern could be adequately addressed by its revised statutory interpretation, which would put the onus of ensuring compatibility of devices on the parties best equipped in the commission's judgment to ensure that compatibility, which is the device manufacturers.  I want to make clear at the outset that that was a question concerning notice obligations under the commission's rule. It's never been the case that a carrier must obtain advance approval from the commission, for example, to switch out copper facilities for fiber ones. But the commission has, for many years, had a set of rules in place that requires carriers, incumbent carriers in this instance, to give public notice when they make a change to the infrastructure they're using to deliver their services. And copper retirement is one instance that triggers that notice obligation. Until 2015, copper retirement hadn't been defined in the commission's rules. But in the 2015 technology transitions order, the commission made clear that copper retirement includes, at that time, it was removal or disabling of the copper facilities. It would be replacing certain facilities with fiber ones, or the commission recognized this idea of de facto retirement, where by neglect of facilities, the facilities would degrade to a point that they were no longer reliably providing service, and to the point that, although they might be technically operational, functionally there was no service. That was the aspect of the definition of copper retirement that the commission dispensed with in the order under review. And the commission reasoned that in the circumstance where a, it thought that concept didn't really have any meaningful benefit, and that was because, first, in the circumstance where a carrier decides, I'm not, I don't want to serve this area anymore, I'm just going to neglect my copper and let it ride until it no longer functions. The commission saw the concept of de facto copper retirement in that circumstance as redundant, because that would trigger already the section 214A notice and approval requirement. There could be a case where a carrier just inadvertently neglects its copper and the copper stops working, but in that case the commission thought there was no practical way for it to enforce any kind of prospective notice requirement, and that knowing that the copper, that copper degradation was the reason for a service quality problem after the fact, didn't confer the kind of meaningful benefit that the earlier commission had hoped. Would you address this issue of, counsel mentions in terms of Chevron deference, and particularly at phase two, and whether we go down the adjugative path or the legislative path on this functionality rule? Okay, so turning back to section 214A, we see this as a Chevron 2 case, and there was no, I think this is exactly, you know, he conceded that the commission can change its statutory interpretation if it recognizes that it's doing so and follows, gives reasoned explanations and follows the procedural requirements for doing so. That's what the commission did here. If Your Honor is asking about the notice issue, there was no requirement for notice here. The original functional test had, was a declaratory ruling without notice and comment in the first instance, and in fact, the petitioners before the commission in earlier proceedings affirmed that no notice and comment was required for that earlier interpretation. It's only now that they are challenging that notice and requirement was necessary, notice and comment was necessary. They could have been wrong before. I mean, maybe they're right now. They could have been, but they weren't. In our view, this is an informal adjudication of the kind the commission reasonably undertakes. At most, if it's any kind of rulemaking, it is a classic example of interpreting existing law. This was giving meaning to section 214A, and an interpretive rule doesn't require notice and comment either. And finally, even if notice and comment were required, there would be no harm to the petitioners here from any technical failing, because they were able to raise, all of these petitioners participated in the proceeding before the agency and raised all of the issues that they're raising before this court, and they shouldn't be allowed to raise notice concerns for third parties not present in this case. May I ask, you said that the order that was implemented in 2015 didn't work, and that's why they were making the move in 2017. What about it didn't work? So on section 214A, I think it was the question of what is a service. That was less, it doesn't work, and more, we think there's a better statutory interpretation that better serves our policy purposes. So really, you're using the argument with a different majority, interpreting it differently. Right, on that issue. But you're right that on the question of de facto copper retirement that we were discussing, and also on the direct notice issues that I don't think are properly before the court, the commission did find in that context that we don't think there's the kind of meaningful benefit here from this concept of de facto retirement, for example, that the earlier commission anticipated, and it explained why. One of the reasons was that it couldn't be enforced in a prospective way if this was just an example of inadvertent neglect. It also thought states could address service quality issues, which California, where all of these petitioners are, does have its own service quality requirements. On the direct notice, question of direct notice to retail customers, although I don't think that's properly before the court, I do want to just briefly make clear that we think in that instance there was new evidence that was significant to the commission's decision. It wasn't just carriers saying this rule is burdensome, as opposing counsel suggested, but the three carriers that control 74% of the market made clear that they give notice voluntarily, and not only notice of the problem,  may I complete my sentence? Not only that they let customers know, voluntarily, that these transitions are underway, but that they educate them, they don't try to upsell them, and there was evidence, too, that the earlier notice requirement had caused customer confusion, because there was a prescribed form of notice,  to tell their customers when they were going to retire, when they were allowed to retire their copper, but that wasn't really the date that was relevant to individual consumers who wanted to know, when are you going to make a change at my house? And carriers have to let consumers know when they're going to make a change at their house, because they need physical access to the property. And for those reasons, and the reasons stated in our brief, if there are no further questions, I'd ask that the petition for review be denied. Thank you. Thank you. May it please the Court, Colin White for U.S. Telecom. The Court's closing colloquy with my friend on the other side gets to the heart of this case. The Commission was right to abandon these rules because the evidence showed that they would harm consumers by delaying the transition from copper to fiber. To take the functional test first, as the Court can see beginning at paragraph 148, the Commission squarely found that the test had caused unnecessary and costly filings and had the potential to delay network upgrades because it was simply too ambiguous. If the Court wants to see evidence on that score, I'd encourage it to look at a submission by AT&T, which is in our supplemental record excerpts beginning at 208, continuing through 210. The Commission went on to find that abandoning the test would therefore benefit consumers who will be able to make use of the improved capabilities of next-generation services that providers can now roll out more quickly. So it's simply not the case, as petitioners say, that the Commission ignored consumers' interest. The Commission simply reached a different conclusion about how best to serve them. The Commission's findings also refute petitioners' view that without this 2015 notice regime, carriers will strand customers without notice. That worry conflates two issues that it is vital to distinguish. If a carrier is discontinuing service, the Commission's 214 rules impose application and notice obligations that protect consumers. If a carrier is not discontinuing service, but simply retiring copper and replacing it with fiber, there's no risk to consumers that justifies the burdens of a Commission notice requirement. And again, the Commission's conclusions on these scores were reasonable not just because they were not rooted in hypothetical concerns. They were instead rooted in evidence. Again, I'd encourage the Court to look at AT&T's submission at 203 to 205 of the supplemental record excerpts, at Verizon's beginning at 268, and CenturyLink's beginning at 22 to 22. Finally, as a practical matter, consumers are voluntarily moving away from copper-bound phone service. The CDC's most recent wireless substitution survey shows that 57.1% of American homes had only wireless telephones during the second half of 2018. That's an increase of 3.2 percentage points since the second half of 2017, when this order was being finalized. Similar preferences hold across many different demographics, and in fact, adults living at or near poverty are more likely than higher-income adults to live in a wireless-only household. Every dollar that carriers no longer must spend supporting outdated equipment that fewer and fewer consumers want is a dollar they can spend to roll out the services of the future. I'm not sure that the statistics prove anything other than we've had a sea change in telephone service in the United States, but it doesn't really address that question of notice, and neither does your last comment that, well, for every dollar you don't spend on copper lines, you can spend on expanding the network, but that doesn't really address whether notice should be required for those who decide to stick with copper lines, does it? That's true, Your Honor. As to that question, we think the Commission's decisions were reasonable for the reasons the Commission gave. Again, as to those circumstances in which a carrier is discontinuing service, the consumer will receive notice. As to those circumstances in which a carrier is merely transitioning them from copper to fiber, there was no harm to the consumer that justified the burdens of the notice requirements that the Commission introduced in 2015 for the reasons that the evidence in the record shows. We therefore support the Commission's decisions and urge the Court not to grant the petition. If there are no questions, I'll yield the balance. Thank you. Will you put three minutes on the clock for rebuttal, please? And the first question I would like you to address, I did look at the corporate disclosure statement, which is pretty naked, so to speak. It just says that Tern is a California nonprofit corporation that operates under 501c3 and has no parent corporation or stockholder. So I'm not quite sure if that advances your cause, but maybe you can suggest otherwise. Your Honor, I would ask, given the importance of this case to the millions of telephone subscribers who are still dependent, that if our showing is insufficient, that pursuant to National Center for Immigrants' Rights vs. INS, which we have cited in our reply brief, that we be allowed to fill in those necessary blanks. I do apologize. We thought the participation of the organization, the FCC... What would you tell us? We would tell you the organizational purpose of Tern, its membership structure, its membership in green lining, and therefore why it has standing pursuant to its own members. I'm not sure anything you just said would confer standing on you. The injury that its members receive which is indeed real and imminent, it is the national policy of the United States to convert all existing legacy lines to IP service. This is the purpose of the FCC. It was identified as a problem going back to the TAC report in 2011, which we reference in our brief. So the injury that they will suffer, including the time necessary to find alternatives, which the 2015 commission found insufficient, is real, will occur, and we are permitted, given that the facts must be taken as true with regard to standing, to rely upon the 2015 finding of the commission that the 180-day notice is necessary to avoid confusion and to find suitable time for the providers. So we do, as we have argued, the injury is real. They do use the phones. They are subscribers. They will be denied ultimately the use of services and devices on which they are dependent. They will be required to find alternatives, and the 2015 commission found that the previous notice rules were inadequate. I would simply say very quickly in response to the previous arguments, one, to call something an adjudication does not mean that it is devoid of process. The adjudications are equally subject to due process. Furthermore, as this court has said, it is not the agency's title. It is the effect. In this case, it is very clear that prior to the first declaratory ruling, I'm sorry, my time is up. If I may just finish the thought. Prior to the first declaratory ruling, there was genuine controversy and confusion with regard the subsequent 2014 order and 2015 petition order on reconsideration, solidified rights, repealing those rights under this court's precedent constitutes a legislative rulemaking which is subject to due process requirements. Thank you. The case just argued, Greenlining v. the FCC, is submitted. I want to thank all counsel for your argument and also for the very good briefing in this case.
judges: McKeown, Bybee, Gaitan Jr.